## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CARMEN S. TALAVERA,**

**Plaintiff,**

v.

**HENRIETTA FORE, Administrator, U.S. Agency for International Development,**

**Defendant.**

**Civil Action No. 07-0720 (JDB)**

## MEMORANDUM OPINION

Plaintiff Carmen Talavera brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., against her former employer, the Administrator of the United States Agency for International Development ("USAID" or "agency"). Talavera alleges that USAID discriminated against her on the basis of her gender and retaliated against her for engaging in protected conduct under Title VII. Currently before the Court is USAID's motion for summary judgment on all claims. For the reasons explained below, the Court will grant summary judgment in favor of USAID.

## BACKGROUND

**I.      General Overview**

Talavera, a female, worked in USAID's Office of Security from September 2001 until September 2005. Talavera Aff. ¶¶ 1, 3 (July 29, 2005); USAID Ex. BB at 1650. USAID's Office of Security is comprised of two divisions, the Personnel, Information and Domestic Security division (the "Information Security division") and the Overseas Physical Security

-1-

Program division (the "Physical Security division").  See Talavera Aff. ¶ 3 (July 29, 2005).

Talavera worked in the Information Security division until July 2003, when she was transferred

to the Physical Security division as a Regional Operations Officer, where she remained for the

duration of her employment with the agency.  Id.  While in the Information Security division, her

first-line supervisor was Don Bisom and her second-line supervisor was Randy Streufert.  See

Talavera Ex. 2(d) at 6.  Director Michael Flannery served as the head of the entire Security

Office until his retirement in August 2004.  See id.; Streufert Dep. at 10:20-21 (June 5, 2008).

During her employment in the Physical Security division, her first-line supervisor was Gaylord

Coston and her second-line supervisor was David Blackshaw.  See Blackshaw Aff. ¶ 1 (July 27,

2005); Coston Aff. ¶ 1.  The other Regional Operations Officers in the Physical Security division

were all male -- Michael Harris, Anthony Mira, Roger Rowe, Michael Lessard and Marcus

Singleton.  See Mira Aff. at 2.

    The gender discrimination and retaliation alleged by Talavera took place from December

2003 through her September 2005 termination.  First Am. Compl. ¶¶ 18-35.  Her Equal

Employment Opportunity ("EEO") complaints address four allegedly discriminatory and

retaliatory events:  (1) a February 2004 request for a mental health screening exam, (2) her June

2004 non-selection for a Security Specialist position, (3) her November 2004 non-selection for a

Lead Security Specialist position, and (4) her September 2005 termination.  See id. ¶¶ 36-50.

## II.    Allegations of Discrimination and Retaliation

### A.    February 2004 Request for a Mental Health Screening Exam

    In December 2003, Blackshaw informed the Regional Operations Officers in the Physical

Security division, including Talavera, that each would have to complete a six-week tour of duty

in Iraq and directed Singleton, another Regional Operations Officer, to create a schedule for the assignments.  <u>See</u> Blackshaw Aff. ¶ 3 (July 27, 2005).  Talavera claims that although she originally volunteered to go to Iraq in May 2004, Singleton scheduled her for October 2004.  Talavera Ex. 2(d) at 7.  When she complained to Blackshaw about her assignment, he suggested meeting with the other Regional Operations Officers to work out the scheduling issues.  <u>Id.</u>; Blackshaw Aff. ¶ 4 (July 27, 2005).

However, according to the final Iraq schedule, Talavera was assigned the July 2004 slot.  Talavera Aff. ¶ 7 (July 29, 2005).  During a February 2004 meeting, while this final schedule was being reviewed, Talavera left the conference room.  <u>See id.</u> ¶ 8.  Blackshaw followed Talavera out of the room and found her crying.  <u>Id.</u>; Blackshaw Aff. ¶ 5 (July 27, 2005).  Talavera told Blackshaw that she had never attended a scheduling meeting with the other Regional Operations Officers.  Talavera Aff. ¶ 8 (July 29, 2005).  For its part, USAID asserts that Singleton organized a scheduling meeting in January 2004, which Talavera, Mira, and Rowe attended, and at that meeting, Talavera agreed to the July 2004 time slot for her tour of duty.  Singleton Aff. at 1 (Oct. 24, 2008); Singleton Aff. ¶ 4 (June 29, 2005); Mira Aff. at 2.  Talavera denies attending this meeting or agreeing to go to Iraq in July.  Talavera Aff. ¶ 8 (July 29, 2005).

After the February 2004 meeting, USAID asserts that Blackshaw became concerned about Talavera.  Blackshaw Aff. ¶ 6 (July 27, 2005).  Spurred by this concern, Blackshaw and Coston contacted Martha Rees, a health service provider employed by USAID.  <u>Id.</u>  According to the agency, Rees recommended that Talavera's required medical evaluation for her trip to Iraq include a mental health screening.  <u>Id.</u>  Rees contacted Dr. Raymond de Castro, a State Department physician, to request this screening.  <u>See</u> Coston Aff. ¶¶ 7-8.  Blackshaw was told

not to inform Talavera that she was going to receive a mental health screening exam.  Blackshaw Aff. ¶ 6 (July 27, 2005).

Before the examination, Dr. de Castro contacted Coston and asked him to provide written examples of incidents that had prompted his concerns about Talavera.  Coston Aff. ¶ 8.  Coston's response discussed three events where "she ha[d] difficulty reasoning":  (1) her behavior at the February 2004 meeting, (2) her September 2003 request for a larger computer monitor from USAID's EEO office and (3) her November 2003 conversation with Coston regarding an "act of favoritism" in leaving a particular job vacancy open.  Talavera Ex. 5.

Dr. De Castro assigned primary responsibility for the screening to another State Department psychiatrist, Dr. Steven Feinstein.  See USAID Ex. B at 2436.  Although Talavera visited Dr. Feinstein twice, in May and June 2004, she never received a mental health screening exam.  See Talavera Dep. at 102:12-16, 119:11-13 (May 14, 2008); Talavera Dep. at 70:14-20 (May 25, 2006).  Talavera asserts that Dr. Feinstein read Coston's email to her during their first meeting, but thought the exam was unwarranted and refused to conduct the exam.  Talavera Aff. ¶¶ 9-10 (July 29, 2005).  Talavera was subsequently cleared to travel to Iraq without ever receiving the exam.  Id. ¶ 11.  On June 8, 2004, she informed USAID's EEO office about the screening request.  See Talavera Dep. at 77:11-21 (May 25, 2006).  Talavera asserts that she told Coston and Blackshaw of her June 8 communication with the EEO office.  Talavera Dep. at 135:24-136:14, 144:5-12 (May 14, 2008).

**B.     June 2004 Non-Selection for Security Specialist Position**

In April 2004, a vacancy announcement was posted for a Security Specialist position with USAID's Industrial Security Program.  See USAID Ex. C.  The program was housed within

Talavera's former division, Information Security.  <u>See</u> USAID Ex. D at 290; Streufert Aff. ¶¶ 4-5.  Talavera applied for the position and -- along with Lessard, Mira, Rowe, and others -- was designated as "best qualified."  <u>See</u> USAID Ex. E.  After reviewing each candidate's application materials, Streufert, the selecting official, conducted separate interviews with each applicant.  Streufert Aff. ¶ 4.  According to him, these interviews played a critical role in his ultimate selection decision.  <u>Id.</u> ¶ 5; Streufert Dep. at 21:13-20, 24:4-9 (June 5, 2008).  Talavera claims that when she spoke to Lessard and Rowe about their interviews, they described different interview questions than the ones she had been asked.  Talavera Ex. 2(f) at 21.  USAID asserts that Streufert asked each applicant the same questions.  Streufert Dep. at 17:5-6, 44:14-19 (June 5, 2008).

USAID further contends that of the six applicants, Streufert found Mira to be the only applicant who was able to describe important aspects of the Industrial Security Program.  <u>See</u> Streufert Dep. at 14:5-9, 18:6-22 (May 24, 2006).  Thus, USAID asserts that Talavera's interview performance was inferior to Mira's.  <u>See</u> Streufert Aff. ¶¶ 6-7.  In June 2004, Streufert selected Mira for the position and destroyed his interview notes two months after USAID's Human Resources office approved this selection.  <u>See</u> Streufert Dep. at 30-31 (May 24, 2006).  In response to her non-selection, Talavera amended her existing EEO charge, pertaining to the screening exam request, to include her non-selection for the Security Specialist position.  <u>See</u> USAID Ex. A at 1752-53.

### C.    November 2004 Non-Selection for Lead Security Specialist Position

In August 2004, a vacancy announcement was issued for a Lead Security Specialist position.  <u>See</u> USAID Ex. G.  Blackshaw was the selecting official for this position.  Blackshaw

Aff. ¶ 12 (July 27, 2005).  Before interviewing any of the candidates, Blackshaw discussed two

of them, Rowe and Harris, with his then-semi-retired supervisor Michael Flannery.  See Talavera

Ex. 13 (Oct. 27, 2004 email from Blackshaw to Flannery).

Talavera applied for the Lead Security Specialist position and was placed on the best

qualified list.  See USAID Ex. H.  At first, Rowe and Singleton were not on the best qualified

list.  See USAID Ex. K at 1450-51.  However, Blackshaw asked USAID's Office of Human

Resources whether Rowe and Singleton could be added to that list due to their "relevant

background, experience and . . . evaluations."  Id. at 1451.  The Office of Human Resources

found Rowe and Singleton "highly qualified" for the position and placed them on the best

qualified list.  See USAID Exs. K, L.

Blackshaw then reviewed the application materials and interviewed each candidate

separately.  Blackshaw Aff. ¶ 12 (July 27, 2005).  Before the interviews, Talavera claims that

Coston coached Singleton, Rowe and Harris on the technical security standards that were

important for the position.  Talavera Ex. 2(f) at 19-20.  USAID responds that Coston coached

Talavera as well.  Coston Aff. ¶ 15.  During the interview, Blackshaw asked each candidate the

same thirty questions, half of which were aimed at determining if the applicant was fluent in

USAID technical security standards.  See USAID Exs. I, J.  USAID claims that Talavera

performed very poorly during her interview, especially with regard to the security standards.

Blackshaw Aff. ¶ 13 (July 27, 2005).  As a result, Talavera did not receive further consideration

for the position and Rowe was ultimately selected.  See Blackshaw Dep. at 21:13-16 (May 24,

2006).  Blackshaw announced Rowe's selection on November 8, 2004.  Talavera Ex. 12 at 4-5.

The parties dispute when Rowe was actually interviewed.  Talavera asserts that, based on

Blackshaw's handwritten interview notes and Human Resources promotion records, Rowe was interviewed on November 29, 2004 -- twenty-one days after his selection.  Talavera Ex. 11 at 3, 27.  USAID counters that Rowe was actually interviewed on October 29 and that the November 29 date was a typo, mistakenly handwritten on Rowe's interview notes, and then wrongly entered into the Human Resources computer system.  USAID Reply at 18-19.  Talavera filed another EEO complaint in November 2004 in connection with her non-selection for the Lead Security Specialist position.  See First Am. Compl. ¶ 5; Talavera Ex. 2(c).

### D.    September 2005 Termination

Talavera's EEO claims were being investigated from May to August 2005.  Talavera Ex. 2 at 1.  Meanwhile, at the end of March 2005, Talavera's supervisors -- Coston and Blackshaw -- informed the Human Resources office of a number of instances of misconduct by Talavera.  See Talavera Ex. 17.  In response, Human Resources drafted a Notice of Proposed Removal for Talavera.  See Merit Systems Protection Board[1] ("MSPB") Tr. at 14:23-18:8 (Mar. 28, 2006).  Coston issued the final Notice of Proposed Removal, which stated that Talavera was being charged with:  (1) "Misrepresentation of Material Fact" and (2) "Providing False Information to a Supervisor."[2]  See USAID Ex. O.

---

[1] The Merit Systems Protection Board is an independent agency within the Executive Branch that provides for adjudication of appeals of personnel actions for federal employees.  Many of the USAID employees involved in this action participated in the MSPB hearings, including Blackshaw, Mira, and USAID Human Resources employees involved with Talavera's termination.

[2] The Notice listed two other charges that the parties agree are not at issue.  See USAID Reply at 20-21.

The events surrounding the "Misrepresentation of Material Fact" charge took place between January and February 2005.  USAID Mem. at 15-18.  In January 2005, Talavera was tasked with preparing a threat assessment document for the Administrator of USAID's upcoming trip to Afghanistan.  <u>See</u> USAID Ex. P.  On January 28, 2005, Talavera sent an email to James McDermott, Regional Security Officer for Afghanistan, asking about security arrangements that were being made for the Administrator's visit.  <u>See</u> USAID Ex. Q at 1859.

As of February 3, 2005, Talavera had not yet received a response from McDermott.  <u>See</u> <u>id.</u> at 1858.  On that date, Talavera submitted a threat assessment, labeled "DRAFT," to Blackshaw.  <u>See</u> Talavera Ex. 20.  Talavera's draft assessment stated that security arrangements had been made although she had not yet received any confirmation from McDermott with regard to these arrangements.  <u>See</u> <u>id.</u>  After submitting the threat assessment to Blackshaw, Talavera sent an email to McDermott again asking for information about security arrangements.  <u>See</u> USAID Ex. S.  On February 4, 2005, McDermott responded by email that the arrangements would be solidified closer to the date of the Administrator's visit.  <u>See</u> <u>id.</u>  Talavera forwarded this response to Blackshaw.  <u>See</u> <u>id.</u>

Upon receiving the forwarded email, Blackshaw was "shocked" that Talavera had given him an incomplete threat assessment and immediately returned the document, instructing her not to resubmit it until it reflected accurate security arrangements.  <u>See</u> <u>id.</u> at 1882; Blackshaw Dep. at 50-51 (Nov. 21, 2005).  Talavera contends that both Blackshaw and Coston understood the February 3 threat assessment to be nothing more than a draft.  Talavera Opp'n at 14.  In response, USAID asserts that even in draft form, threat assessments must contain accurate security information.  <u>See</u> Blackshaw Dep. at 69:13-70:13 (Nov. 21, 2005); MSPB Tr. at 17:18-19:1,

48:4-19 (Apr. 19, 2006).  The agency contends, then, that this misrepresentation of material fact is an offense that warrants termination.  See MSPB Tr. at 43:24-45:10 (Mar. 28, 2006); USAID Ex. CC at 1847 ¶¶ 51, 53.

USAID also claims that Talavera provided false information to Blackshaw and Coston, another offense that supports termination.  See USAID Ex. CC at 1847.  On February 17, 2005, Talavera sent McDermott another follow-up email about the Afghanistan security arrangements, and that same day, McDermott responded curtly that the information was not available and that Talavera "direct any further questions about the way we do things here in the field" to someone else.  See USAID Ex. Q at 1855-56.  Later that day, according to USAID, Talavera told Blackshaw that she had received a call from McDermott apologizing for his email.  See USAID Ex. O at 1411; USAID Ex. T at 2296; Blackshaw Dep. at 53:19-20 (Nov. 21, 2005).  Blackshaw later emailed McDermott to see whether he had called Talavera and McDermott said he had not. USAID Ex. U.

Talavera remembers a different conversation surrounding the false information charge. She asserts that she specifically told Blackshaw that she could not say whether the "Jim" she spoke to on the phone was McDermott.  Talavera Ex. 19 at 13.  She twice claimed, in March and April 2005, that she received a call from a Jim who "[she] understood was the EXO from Kabul [McDermott]," but she asserts that, both times, this was a typo -- she meant to say that she received a call from a Jim who "[Blackshaw] understood to be the Kabul EXO."  See USAID Exs. V, W; Talavera Dep. at 295:11-311:11 (May 14, 2008).  Talavera contends that the call from "Jim" concerned a delay in billing and was unrelated to the Afghanistan security arrangements.  USAID Ex. AA at 2276.

USAID claims that initially Blackshaw did not want to terminate Talavera, but that he concluded that because she continued to change her story regarding the McDermott phone call, "her potential for rehabilitation [was] nonexistent."  USAID Ex. T at 2297; USAID Ex. BB at 1650.  Talavera was terminated in September 2005.  <u>See</u> USAID Ex. BB at 1650.

## III.    Procedural History

On March 24, 2007, Talavera received authorization from the Equal Employment Opportunity Commission ("EEOC") to file a judicial complaint.  First Am. Compl. ¶ 4.  She filed her initial complaint in this Court on April 23, 2007 and her first amended complaint followed on January 4, 2008.  As detailed above, her first amended complaint alleges four instances of gender discrimination and retaliation in violation of Title VII.[3]  First Am. Compl. ¶¶ 36-50.

Now before the Court is USAID's motion for summary judgment on all claims.  Talavera argues that the evidence in the record establishes genuine issues of material fact that require resolution by a jury and thus preclude summary judgment.  <u>See</u> Talavera Opp'n at 2.  USAID generally responds that there are no genuine issues of material fact and that, on all counts, it has proffered a legitimate, non-discriminatory and non-retaliatory reason for its actions, and there is nothing in the record to demonstrate that these reasons are pretextual.  <u>See</u> USAID Mem. at 2-3.

<u>**LEGAL STANDARD**</u>

## I.    Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

---

[3] With regard to the mental health screening request, Talavera has since agreed to limit her claim to retaliation only.  <u>See</u> Talavera Opp'n at 27.

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its

motion by identifying those portions of "the pleadings, the discovery and disclosure materials on

file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material

fact.  Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the

"mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence

on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## II.     The **McDonnell Douglas** Framework

The framework for establishing a prima facie case of discrimination or retaliation was

introduced for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie

case by a preponderance of the evidence.  Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S.

248, 252-53 (1981).  In order to make out a prima facie case of discrimination, a plaintiff must

show that "(1) she is a member of a protected class; (2) she suffered an adverse employment

action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)). To establish a prima facie case of retaliation, a plaintiff must establish: "(1) that she engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)); Brown, 199 F.3d at 452. Under the Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70 (2006), an adverse employment action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination. See also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's burden, however, is merely one of production. Burdine, 450 U.S. at 254-55. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

Where assessment of the employer's legitimate, non-discriminatory reason becomes necessary, a prolonged evaluation of the sufficiency of plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a

prohibited basis."  See Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008);

see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing St.

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of

Governors v. Aikens, 460 U.S. 711, 714-16 (1983)).  "Whether judgment as a matter of law is

appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength

of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation

is false, and any other evidence that supports the employer's case and that properly may be

considered on a motion for judgment as a matter of law."  Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 148-49 (2000); accord Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289

(D.C. Cir. 1998) (en banc); see also Waterhouse v. District of Columbia, 298 F.3d 989, 992-993

(D.C. Cir. 2002).

　　　　In other words, the McDonnell Douglas shifting burdens framework effectively

evaporates -- the sole remaining issue is discrimination or retaliation vel non, and "to survive

summary judgment the plaintiff must show that a reasonable jury could conclude from all of the

evidence that the adverse employment decision was made for a discriminatory reason."  Lathram

v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.  Examination of

that issue in this setting therefore requires consideration of all the relevant circumstances in

evidence, including the strength of the prima facie case, any direct evidence of discrimination,

any circumstantial evidence that defendant's proffered explanation is false (which may be

enough with the prima facie case to infer unlawful discrimination or retaliation), and any

properly considered evidence supporting the employer's case.  Reeves, 530 U.S. at 147-48; see

also Adeyemi, 525 F.3d at 1226; Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C.

Cir. 2004); Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

## ANALYSIS

I.      **February 2004 Request for Screening Exam -- Retaliation Claim (Count III)**[4]

As a threshold matter, the Court must determine whether USAID's request for a mental

health screening exam was an adverse action.  See Mitchell, 759 F.2d at 86.  An action is

"adverse" if a plaintiff can show "that a reasonable employee would have found the challenged

action materially adverse, 'which in this context means it might well have dissuaded a reasonable

worker from making or supporting a charge of discrimination.'"  Burlington Northern, 548 U.S.

at 68 (quoting Rochon, 438 F.3d at 1219) (quotations omitted).

Talavera argues that the request for a mental health screening exam is an adverse action.

See Talavera Opp'n at 26.  However, in applying the Burlington Northern standard, courts

generally have found that a psychiatric exam, by itself, is not inherently adverse.[5]  See, e.g.,

Franklin v. Potter, 600 F. Supp. 2d 38, 67-68 (D.D.C. 2009) (finding that where a psychological

_____

[4] Talavera's first amended complaint alleges three distinct counts of discrimination and retaliation relating to (1) her September 2005 termination (Count I), (2) her non-selection for both the June 2004 Security Specialist position and the November 2004 Lead Security Specialist position (Count II) and (3) the February 2004 mental health screening exam request (Count III). The Court will consider these counts in chronological order, beginning with Count III.

[5] The post-Burlington Northern cases that find that a psychiatric examination is an adverse action are distinguishable from this case.  In those cases, the fitness for duty exam tends to be combined with an additional employment action, such as involuntary leave or an indication of the exam in an employee's permanent record.  See, e.g., Dodd v. SEPTA, No. 06-4213, 2008 WL 2902618, at *14 (E.D. Pa. July 24, 2008) (finding that when a psychiatric exam is placed in an employee's personnel file and may impact future employment, that exam is a materially adverse action); Murry v. Gonzales, No. 5:04-498, 2006 WL 2506963, at *10 (M.D. Fla. Aug. 28, 2006) (finding that when psychiatric exam was "inextricably intertwined" with employee's reduction of job duties and transfer, there is a genuine issue of material fact as to whether the exam is an adverse action); Flynn v. New York State Div. of Parole, 620 F. Supp. 2d 463, 495 (S.D.N.Y. 2009) (holding that a mandatory psychiatric exam combined with supervisors advising coworkers that plaintiff was mentally unstable could be considered an adverse action).

exam itself was not "egregious," it could not be a materially adverse action as required by

Burlington Northern); Nichols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 786-87 (7th Cir.

2007) (holding that when there is no impact on position, salary or benefits, plaintiff did not

suffer materially adverse action by being placed on administrative leave pending the outcome of

a fitness for duty examination); Cotton v. AT&T Operations, Inc., No. 4:06-438, 2007 WL

2259318, at *9 (E.D. Mo. Aug. 2, 2007) (finding that a plaintiff who received full pay during

leave of absence and was reinstated following fitness for duty examination did not suffer a

materially adverse action).  Additionally, "[t]he issue of whether a particular employment action

was 'materially adverse' is fact-intensive and 'depends upon the circumstances of the particular

case, and should be judged from the perspective of a reasonable person in the plaintiff's position,

considering all the circumstances.'"  Howard v. Gutierrez, 237 F.R.D. 310, 313 (D.D.C. 2006)

(quoting Burlington Northern, 548 U.S. at 71) (quotations omitted).

In this case, although Talavera visited the doctor twice, she never actually received a

mental health screening exam.  See Talavera Dep. at 70:14-20 (May 25, 2006).  Moreover, she

was cleared for and in fact did travel to Iraq, see Talavera Dep. at 136:15-16 (May 14, 2008),

demonstrating that the request for the screening exam did not adversely affect her work

assignments.  Talavera also fails to point to any evidence suggesting that the request for the

exam became part of her personnel file or was considered during her performance evaluations.

Hence, the exam request stands alone, and there is nothing in the record to suggest that any

negative consequences flowed from it.  The Court concludes, then, that the request for a mental

health screening exam was not an adverse action and therefore Talavera has failed to make out a

prima facie case of retaliation.  Accordingly, the Court will grant summary judgment to USAID

with regard to this claim (Count III).

## II.    June 2004 Non-Selection for Security Specialist Position -- Retaliation and Gender Discrimination Claims (Count II)

Talavera next argues that by not promoting her to the Security Specialist position, her

former supervisor Streufert (1) retaliated against her for filing an EEO complaint in connection

with the February 2004 screening exam request and (2) discriminated against her based on her

gender by promoting a less qualified male.  See First Am. Compl. ¶ 42.  In response, USAID

argues that (1) Streufert had no knowledge of Talavera's EEO complaint when he made his

selection and therefore could not have retaliated against her and (2) the agency had a legitimate,

non-discriminatory reason for her non-selection (her poor interview performance) that she

cannot overcome with sufficient evidence of pretext.  USAID Mem. at 35-38.

### A.    Retaliation Claim

USAID disputes that there is a causal connection between Talavera's June 8, 2004 EEO

filing[6] and the June 16, 2004 selection of Mira for the Security Specialist position.  See USAID

Mem. at 35.  To establish a causal connection for purposes of a prima facie case of retaliation, an

employer must know about the statutorily protected activity before it can be inferred that an

_____

[6] Talavera also asserts that Streufert retaliated against her for sexual harassment complaints she made in 2002 and her September 2003 communication with the EEO office about her computer monitor.  However, both of these events are too far removed from her June 2004 non-selection to establish the requisite causal connection.  See Cooke v. Rosenker, 601 F. Supp. 2d 64, 88 (D.D.C. 2009) ("[A] six-month delay by itself is insufficient to demonstrate the close temporal proximity necessary to infer a retaliatory motivation."); Kwon v. Billington, 370 F. Supp. 2d 177, 187 (D.D.C. 2005) (citing Woods v. Bentsen, 889 F. Supp. 179, 187 (E.D. Pa. 1995) ("[C]ourts generally hold that if at least four months pass after the protected activity without employer reprisal, no inference of causation is created."); Brodetski v. Duffy, 199 F.R.D. 14, 20 (D.D.C. 2001) (finding that "courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length").

adverse employment action is retaliatory.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268,

273 (2001).

Streufert contends that he was not aware of Talavera's EEO activity until November

2004, four months after he made his selection, see USAID Ex. F (Streufert Statement, Oct. 17,

2008), and hence, no causal connection exists.  In response, Talavera argues that Streufert must

have known of her June 8, 2004 EEO complaint because Coston and Blackshaw knew of her

complaint, see Talavera Ex. 8, and "Streufert and Coston and Blackshaw held management

meetings and discussed personnel matters in their department on a regular basis," Talavera Ex.

2(g) ¶ 6.  "When confronted with unequivocal sworn statements denying knowledge, as here,

'mere speculation . . . fails to create a genuine issue of material fact to avoid summary

judgment.'"  Test v. Holder, 614 F. Supp. 2d 73, 82 (D.D.C. 2009) (quoting Esquibel v. Lahood,

604 F. Supp. 2d 133, 137 (D.D.C. 2009)) (quotations omitted).  Talavera admits that "the only

way that I would think that [Streufert] would know [about the June 2004 EEO complaint] was

because again they all communicated with each other" and "hung out together."  Talavera Dep.

at 177:13-179:8 (May 14, 2008).  Because Streufert unequivocally denies that he knew of the

complaint and Talavera presents no evidence to refute this assertion, her argument amounts to

"mere speculation."  See Test, 614 F. Supp. 2d at 82.  Therefore, Talavera cannot establish the

requisite causal connection for her retaliation claim and the Court will grant summary judgment

in favor of USAID on this aspect of Count II.

### B.    Discrimination Claim

Talavera also contends that in promoting a male to the Security Specialist position,

USAID discriminated against her on the basis of her gender.  The agency counters by proffering

a legitimate, non-discriminatory reason for Talavera's non-selection -- that her interview

performance was inferior to Mira's, the ultimate selectee.[7]  See Streufert Dep. at 10:14-24:2,

29:23-30:7 (May 24, 2006); Streufert Aff. ¶¶ 6-7.  Under the McDonnell Douglas framework,

once an employer has articulated a legitimate, non-discriminatory reason for an adverse

employment action, the "district court must resolve one central question: Has the employee

produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the employee on the basis of race, color, religion, sex, or national origin?"  Brady, 520

F.3d at 494.  Talavera contends that several pieces of evidence demonstrate that USAID's

proffered reason is pretextual:  (1) statements allegedly made by Flannery to Talavera that

Streufert had problems working with women; (2) statements allegedly made by Mike Lessard,

another interviewee for the Security Specialist position, which demonstrate that Talavera was

asked different interview questions than the male interviewees; (3) statements allegedly made by

Streufert that the "men had a bond with each other because they had all served in the military";

(4) Mira's allegedly inferior qualifications; (5) statistical evidence of a preference for promoting

men in the Office of Security; and (6) Streufert's destruction of his interview notes only two

months after the selection.

---

[7] Talavera contends that because Streufert destroyed his interview notes, USAID should
be precluded from relying upon her interview performance as its legitimate, non-discriminatory
reason for her non-selection.  Talavera Surreply at 6-7.  This would be appropriate, according to
Talavera, because courts can sanction parties for negligent destruction of documents.  Id.
However, Talavera points to no authority supporting complete preclusion of USAID's proffered
non-discriminatory reason based on the destruction of interview notes.  The Court concludes,
then, that although the destruction of interview notes informs the pretext analysis, it does not
justify the complete bar that Talavera seeks.

Talavera first argues that Flannery's statements that Streufert "was not culturally sensitive," had "many issues with women" and "couldn't deal being an equal colleague to a woman" demonstrate Streufert's discriminatory intent.  See Talavera Ex. 2(d) at 14.  Likewise, Talavera contends that Lessard's statements suggesting that Streufert asked different interview questions to the male candidates proves pretext.  See Talavera Ex. 2(f) at 21.  USAID counters that the alleged statements of Flannery and Lessard are inadmissible hearsay.[8]  See USAID Response to Talavera Surreply ("USAID Response") at 6.

Hearsay evidence -- a statement made by an out-of court declarant "offered in evidence to prove the truth of the matter asserted" -- is inadmissible unless it falls within a statutory exception.  See Fed. R. Evid. 801, 802.  Talavera argues that the two statements at issue here both qualify as party admissions under Federal Rule of Evidence 801(d)(2)(D).  Talavera Surreply at 4-6.  Under Rule 801(d)(2)(D), a statement is a party admission when made "by the party's agent or servant concerning a matter within the scope of the agency or employment . . . during the existence of the relationship."  To begin with, the Court agrees with USAID that Lessard's statement is not covered by Rule 801(d)(2)(D).  See USAID Response at 8.  As a Regional Operations Officer and an interviewee, Lessard had no authority over the interview process or selection of the Security Specialist and had no obligation as an agency employee to communicate the details of Streufert's interview questions to any of his co-workers.  Lessard's

_____

[8] USAID also challenges these statements on the grounds that they are contained in unsworn documents attached to Talavera's EEO complaint.  Talavera counters that the documents are properly sworn because she states in her November 20, 2008 affidavit that "I have reviewed the documents comprising my EEO counseling memos, complaints and affidavits that I previously signed regarding the above matter. They are true and correct based upon my personal knowledge."  Talavera Ex. 2(g) ¶ 2.  Without deciding the issue, the Court will assume for present purposes that Talavera's statements are properly sworn.

statements therefore fall outside the scope of his employment duties as an agent of USAID.  See, e.g., Conley v. City of Findlay, 266 F. App'x 400, 411 (6th Cir. 2008); Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 297-98 (3d Cir. 2007); Hill v. Spiegel, Inc., 708 F.2d 233, 236-37 (6th Cir.1983).  Hence, the Court will disregard the statements allegedly made by Lessard as inadmissible hearsay.[9]

Similarly, USAID argues that Talavera has failed to establish the admissibility of Flannery's statements because she has not shown when or in what context the statements were made.  USAID Response at 7.  Based upon the record, Talavera has established only that "Flannery was the Director of Security when he made any statements to me regarding Randy Streufert's attitudes towards women," which covers the time period from September 2001 (when she was hired) through August 2004 (Flannery's official retirement).  Talavera Aff. ¶ 3 (Jan. 16, 2009); see Streufert Dep. at 10:20-21 (June 5, 2008).  Morever, Talavera does not provide the details of this conversation and there is nothing in the record to put the statement into context -- i.e., whether it was made in the workplace or otherwise.  Devoid of such context, Talavera fails to establish a link between Flannery's conclusory statements, which do not deal directly with Streufert's attitudes toward hiring or promoting women, and her non-selection.  See Sewell v. Chao, 532 F. Supp. 2d 126, 139 (D.D.C. 2008) (finding that when no "nexus" exists between allegedly discriminatory comments and the decision-making process, the comments do not support a discriminatory motive); Figures v. Bd. of Pub. Utils., 967 F.2d 357, 360-61 (10th Cir. 1992) (finding that in a Title VII race discrimination case, evidence of racial comments is not probative of any issue in the case unless it is linked to "hiring, firing, or promoting").  Therefore,

---

[9] Although Lessard could have been deposed, or submitted a sworn affidavit based on his own personal knowledge, Talavera apparently chose not to pursue or include such support.

even if admissible under Rule 801(d)(2)(D), Flannery's statements are not probative of discriminatory intent or pretext.

As additional evidence of pretext, Talavera attributes only one allegedly discriminatory statement to the decision-maker himself (Streufert) asserting that he told her that "men here have a bond with each other because they've all served in the military, it's a guy thing."  Talavera Ex. 2(d) at 6.  However, stray remarks, "even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff."  Simms v. U.S. Gov't Printing Office, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000); see also Sewell, 532 F. Supp. 2d at 139 n.8 ("Evidence of discrimination 'does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself.'").  This ambiguous remark, made before Talavera joined the Physical Security division in July 2003, does not relate to Streufert's decision to hire Mira in June 2004 and hence does not aid Talavera in demonstrating pretext.

Similarly, while USAID's records may show a tendency to promote men, see Talavera Ex. 14, "'statistical evidence is only one small part of a substantial web of evidence indicating pretext.'"  Horvath v. Thompson, 329 F. Supp. 2d 1, 10 (D.D.C. 2004) (quoting Bell v. Envtl. Prot. Agency, 232 F.3d 546, 553 (7th Cir. 2000)); see also Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir.1984) (finding that statistical evidence is generally "less significant" in disparate treatment cases); Simpson v. Leavitt, 437 F. Supp. 2d 95, 104 (D.D.C. 2006) (finding that statistical evidence "alone is insufficient to create an inference of disparate treatment.").  Hence,

at the summary judgment stage, statistical evidence by itself is not enough to show discriminatory intent on the part of Streufert.

Talavera next claims that Mira's objective qualifications were inferior to hers, therefore demonstrating that Streufert made his selection with discriminatory bias. Specifically, Talavera asserts that she was more qualified than Mira because she had previously worked for the Information Security division, where the Security Specialist position was located, for almost two years and that she had a longer tenure at USAID than Mira. See Talavera Opp'n at 31; Talavera Ex. 9. USAID counters that the job responsibilities for the Security Specialist position were entirely different from Talavera's Information Security responsibilities; hence, because of the position's unique requirements, Talavera's longer tenure at USAID does not demonstrate that she was more qualified than Mira. See USAID Reply at 14; Streufert Dep. at 46:9-52:1 (June 5, 2008).

To establish pretext in a non-selection case, a plaintiff must show that she was "significantly better qualified for the job" than the ultimate selectee. Washington v. Chao, 577 F. Supp. 2d 27, 43-44 (D.D.C. 2008); see also Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (same). Furthermore, this "qualifications gap must be 'great enough to be inherently indicative of discrimination.'" Adeyemi, 525 F.3d at 1227 (quoting Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007)). Here, Talavera does not dispute that her job responsibilities in the Information Security division were different than those for the Security Specialist position. Moreover, Talavera only worked at USAID one year longer than Mira, hardly a substantial gap. See Talavera Ex. 9. Because Talavera presents nothing more to demonstrate that she was "significantly better qualified" than Mira, this evidence fails to support an inference of pretext.

Talavera's remaining evidence of pretext relates to Streufert's destruction of his interview notes two months after he selected Mira for the Security Specialist position.  Talavera contends that the destruction of the interview materials, by itself, is enough to create a triable issue for the jury.  See Talavera Opp'n at 29.  According to Talavera, the destruction of interview notes two months after Mira's selection violated USAID's document retention policy, which required promotion records to be retained for two years.  See Talavera Exs. 25, 26.  She also asserts that once she amended her original EEO complaint to include her non-selection, the agency had an obligation to secure all promotion records for the Security Specialist position.  Talavera Opp'n at 29-30.

As a preliminary matter, the Court agrees with the agency that Streufert's destruction of the notes was at worst negligent.  Although USAID did have an obligation to preserve the interview materials, at least once Talavera amended her EEO complaint to include the non-selection, see Arista Records v. Sakfield Holding Co., 314 F. Supp. 2d 27, 34 n.3 (D.D.C. 2004), the circumstances surrounding the destruction do not demonstrate bad faith.  As discussed above, the record does not establish that Streufert even knew of Talavera's EEO complaint prior to November 2004, months after he destroyed his notes.  See USAID Ex. F (Streufert Statement, Oct. 17, 2008).  Morever, although the destruction of the notes was against official USAID policy, see Talavera Exs. 25, 26, it was Streufert's normal practice to destroy his interview notes within a few months after his selection was certified by the Human Resources Office.  See Streufert Dep. at 31:10-17 (May 24, 2006).  It is unrefuted that he followed this practice for "about two dozen" prior selection decisions.  Id.  The evidence demonstrates, then, that Streufert simply adhered to his normal practice with respect to the June 2004 Security Specialist position.

Without evidence of bad faith, any adverse inference to be drawn from the negligent destruction of the interview materials is considerably weaker than that accompanying a deliberate destruction.  See Mazloum v. District of Columbia Metro. Police Dep't, 530 F. Supp. 2d 282, 293 (D.D.C. 2008); Chappell-Johnson v. Bair, 574 F. Supp. 2d 87, 102 (D.D.C. 2008).

However, even if Talavera were entitled to a weak adverse inference regarding the destruction of the notes, it would not be sufficient to survive summary judgment.  The "destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence -- or utterly inadequate evidence -- in support of a given claim to survive summary judgment on that claim." von Muhlenbrock v. Billington, 579 F. Supp. 2d 39, 45 (D.D.C. 2008) (quoting Chappell-Johnson, 574 F. Supp. 2d at 102); Smith v. Napolitano, No. 07-1045, 2009 WL 1740520, at *19 (D.D.C. June 22, 2009) (same); Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107, 109 (2d Cir. 2001) (finding that an adverse inference must be "in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action . . . to survive summary judgment") (quoting Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998)).  The only additional evidence that Talavera presents is the statistical evidence showing a tendency toward male promotion and the ambiguous, stray remark by Streufert regarding the military bond between male employees, neither of which are probative of discriminatory intent or pretext.  In light of Talavera's lack of evidence supporting discriminatory intent, the Court will not deny summary judgment based only on the negligent destruction of Streufert's interview notes.

In sum, then, when the Court considers all of the relevant evidence mustered by the parties, as it must, see Brady, 520 F.3d at 495, Talavera has simply not produced enough

evidence to support a finding of pretext.  No single piece of evidence that she presents, standing

alone, is sufficient to defeat summary judgment.  Moreover, even when her evidence (i.e., the

promotion statistics, Streufert's stray comment about male bonding and Streufert's destruction of

the interview notes) is considered together it is still insufficient to overcome USAID's stated

reason for its decision.  There is, after all, no nexus between Streufert's comment and any

employment decision, and his destruction of his notes, while against USAID policy, was his

customary practice and was not unique to this case.  Without additional meaningful evidence,

then, a reasonable jury could not conclude that USAID's legitimate, non-discriminatory reason

for Talavera's non-selection was pretext for discrimination.  See Simpson, 437 F. Supp. 2d at

104; von Muhlenbrock, 579 F. Supp. 2d at 44-45.  Therefore, the Court will grant summary

judgment in favor of USAID on this aspect of Count II.

III.    **November 2004 Non-Selection for Lead Security Specialist Position -- Gender Discrimination and Retaliation Claims (Count II)**

Talavera next claims that, by failing to promote her to a Lead Security Specialist position

in November 2004, USAID retaliated against her for filing and amending her June 2004 EEO

complaint and discriminated against her based on her gender by promoting Rowe, a less

qualified male.  Talavera Opp'n at 33.  USAID has proffered a legitimate, non-discriminatory,

non-retaliatory reason for Talavera's non-selection -- her interview performance.  See Blackshaw

Aff. ¶ 13 (July 27, 2005); USAID Ex. N at 353-54.  Once again, then, the Court proceeds

directly to the ultimate question of discrimination and retaliation vel non.[10]  See Brady, 520 F.3d

at 494.  To demonstrate that USAID's asserted reason is pretextual, Talavera contends that (1)

---

[10] This analysis of pretext therefore applies to both the discrimination and retaliation
claims arising from Talavera's November 2004 non-selection.

Blackshaw preselected Rowe for the position and (2) she was more qualified for the Lead

Security Specialist position than Rowe.[11]

To begin with, Talavera has offered very weak evidence that USAID improperly

preselected Rowe.  Primarily, she relies upon Blackshaw's handwritten interview notes -- later

transferred into the Human Resources computer system -- indicating that Rowe was interviewed

on November 29, 2004, not October 29, as the agency contends.  See USAID Ex. J.  This

documentation is supplemented by her own statements that (1) she does not recall seeing Rowe

at work on October 29, 2004 and (2) she was asked to prepare a morning report for October 29,

usually Rowe's responsibility.  See Talavera Aff. ¶¶ 5-8 (Jan. 16, 2009).  Talavera contends that

this evidence establishes that Rowe was interviewed three weeks after his selection was

announced on November 8, 2004.  Talavera Ex. 12 at 4-5.

In response, USAID presents an email drafted by Coston on October 29, 2004 indicating

that Rowe was present at work that day and another email written by Coston on that date

showing that he, not Talavera or Rowe, prepared the morning report.  See Coston Aff. (Jan. 28,

2009), Exs. A, B.  Additionally, USAID presents evidence, both documentary and testimonial,

---

[11] Talavera also argues that there is a factual dispute whether Coston's coaching session
with the Regional Operations Officers applying for the Lead Security Specialist position
included her.  Compare Coston Aff. ¶ 15 ("I sat down with Roger [Rowe], Mike Harris, Marcus
Singleton, and Carmen [Talavera], who were all eligible for the position, to provide guidance on
how to perform well on their interviews [for the Lead Security Specialist position].") with
Talavera Ex. 2(f) at 19-20 ("I was excluded from this male-dominated group and not afforded the
same rehearsal [for the Lead Security Specialist interview].").  USAID correctly points out that
the record does not show that Blackshaw, the selecting official, instructed Coston to groom a
certain candidate for the position, and hence no nexus exists between Coston's allegedly
discriminatory coaching session and Blackshaw's selection decision.  Morever, the technical
security standards that Coston stressed in the coaching session were also included in the position
description itself.  See Coston Aff. ¶ 15; USAID Ex. M at 302, 304-05.  Therefore, this factual
dispute is immaterial for summary judgment purposes.

corroborating the date of Rowe's interview as October 29, 2004, not November 29.  See USAID

Reply Attach. 1 (Blackshaw's personal calender noting October 29 as the interview date); Rowe

Aff. (Jan. 5, 2009) (confirming that his interview took place during the last week of October);

Talavera Ex. 15 at 2 (November 23, 2004 memorandum from Blackshaw to the EEO Office,

describing Rowe's interview performance); Blackshaw Aff., (Jan. 28, 2009) (confirming the

November 29 typo and the October 29 interview date).  In light of this overwhelming evidence,

it is clear that the discrepancy in the dates is nothing more than a scrivener's error by Blackshaw,

which in turn led to the entry of the incorrect date in the Human Resources computer system.

The record establishes, then, that Rowe was interviewed on October 29, well before his selection

was announced.  Consequently, this evidence lends no support to Talavera's preselection theory.

Talavera's remaining evidence of preselection -- an email exchange between Flannery

and Blackshaw discussing the qualifications of Rowe and Harris for the Lead Security position --

also fails to demonstrate that Blackshaw preselected Rowe in violation of USAID promotion

procedures.  See Talavera Ex. 13.  Although Flannery's email specifically advises Blackshaw to

choose Rowe, evidence of "[p]reselection, by itself, does not necessarily show pretext."  Fields v.

Johanns, 574 F. Supp. 2d 159, 164 (D.D.C. 2008); Napolitano, 2009 WL 1740520, at *15.  Thus,

"[e]ven if there ha[s] been favoritism in the selection [process] . . . '[p]reselection . . . does not

violate Title VII when such preselection is based on the qualifications of the party and not on

some basis prohibited by Title VII.'"  Nyunt v. Tomlinson, 543 F. Supp. 2d 25, 39 (D.D.C. 2008)

(quoting Goostree v. Tennessee, 796 F.2d 854, 861 (6th Cir. 1986)); see Pearsall v. Holder, 610

F. Supp. 2d 87, 100 n.12 (D.D.C. 2009) (granting summary judgment where plaintiff "offers no

evidence from which a reasonable factfinder could conclude that [the selectee] was preselected

for discriminatory reasons"); <u>Oliver-Simon v. Nicholson</u>, 384 F. Supp. 2d 298, 310 (D.D.C.

2005) ("[P]laintiff's pre-selection claim does not advance her case for pretext unless she

produces some evidence that discrimination played a role in [the selectee's] pre-selection and

thus the plaintiff's non-selection.").  Nothing in this email shows that Blackshaw selected Rowe

"based on factors other than the candidates qualifications for the job."  <u>See</u> Talavera Ex. 25

(USAID promotion regulations).  In fact, the email discusses Rowe's "steadiness, leadership

skills, [and] integrity" with regard to his potential for promotion.  <u>See</u> Talavera Ex. 13.  Hence,

without additional indicia of improper discriminatory or retaliatory preselection, this email is

insufficient to demonstrate pretext.

Lastly, Talavera argues that she was more qualified than Rowe.  Talavera Opp'n at 33.

She first points to the fact that, unlike herself, Rowe was not initially placed on the "best

qualified" list for the position.  Consequently, the agency had to receive special dispensation

from the Human Resources office for Rowe to be granted an interview.  <u>See</u> Talavera Ex. 12.

She asserts that this special dispensation violated a USAID personnel rule providing that

"minimally qualified applicants" may be placed on the interview list if "highly qualified

applicants cannot be identified."  <u>See</u> Talavera Ex. 25 at 5.  According to Talavera, this violation

establishes pretext and bolster's her claim that Rowe was preselected.  Yet the record shows that

the agency's Human Resources office deemed Rowe a "highly qualified" applicant, not a

"minimally qualified" one, making this particular personnel rule inapplicable.  <u>See</u> Talavera Ex.

12 at 2.  The record also supports USAID's assertion that Blackshaw followed agency procedure

in recommending Rowe for the interview list and that Human Resources made an independent

determination that Rowe was "highly qualified" for the position.  <u>See</u> <u>id.</u> at 2 (email from Human

Resources finding Rowe "highly qualified"), 8 (explaining that a candidate may be put on the best qualified list (I) according to their self-assessment score and being deemed highly qualified for the position or (ii) when the Human Resources office finds that, despite their score, a candidate is highly qualified for the position).  The request that Rowe be placed on the interview list also fails to bolster Talavera's preselection theory.  Blackshaw, in the same email to Human Resources that recommends Rowe, also recommends that Singleton be placed on the interview list.  Singleton is a candidate who was not previously discussed by Blackshaw and Flannery in relation to the Lead Security Specialist position and his inclusion in Blackshaw's email undermines any suggestion that Rowe was singled out for favorable treatment.  See USAID Ex. K at 1450-51.

Talavera also contends that her "objective score" that placed her on the "best qualified" list was higher than Rowe's, proving that she was more qualified.  See Talavera Opp'n at 33. This assertion, too, fails to establish pretext.  Talavera's "objective score" was based on her own self-assessment, reviewed by the Human Resources office to make sure it was not unduly inflated.  See Pierce Dep. at 7:18-23, May 24, 2006.  Although it was independently reviewed, this self-assessment score is only her own self-perception of her credentials, which is irrelevant for purposes of establishing discriminatory or retaliatory conduct.  See Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) ("'[P]laintiff's perception of h[er]self, and of h[er] work performance, is not relevant. It is the perception of the decisionmaker which is relevant.'") (quoting Smith v. Chamber of Commerce, 645 F. Supp. 604, 608 (D.D.C. 1986)).  In any event, Talavera does not even contend that she was "significantly better qualified" than Rowe.  See Washington, 577 F. Supp. 2d at 43-44.  She herself admits that "I wasn't necessarily more

-29-

[qualified], but I was just as qualified as [Rowe]" and "I never said I was more qualified than Mr. Rowe."  Talavera Dep. at 181:21-24, 222:12, May 14, 2008.

In light of the foregoing, the Court concludes that no reasonable jury could find discriminatory or retaliatory pretext underlying USAID's decision not to promote Talavera. Talavera's theory of preselection -- which is essential to her claim of pretext -- is simply not supported by the record.  Moreover, even if Rowe was preselected, there is no evidence from which a reasonable jury could infer that he was preselected for a discriminatory or retaliatory purpose.  Hence, the Court will grant summary judgment in favor of USAID on both Talavera's discrimination and retaliation claims relating to her November 2004 non-selection.

## IV.     September 2005 Termination -- Gender Discrimination and Retaliation Claims (Count I)

Finally, Talavera argues that USAID terminated her in a discriminatory and retaliatory manner.  USAID has offered a legitimate, non-discriminatory, non-retaliatory reason for Talavera's termination by referencing the relevant allegations in her Notice of Proposed Removal.  Assuming, then, that Talavera has made out a prima facie case, the Court proceeds to the pretext analysis by weighing "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Reeves, 530 U.S. at 148-49.  To satisfy her burden, Talavera contends that the allegations in the Notice of Proposed Removal were false.

Two charges in the Notice were terminable offenses.  See MSPB Tr. at 43:24-45:10 (Mar. 28, 2006).  Either charge alone could warrant termination.  Id.; USAID Ex. CC at 1847. The first, "Misrepresentation of Material Fact," alleges that Talavera submitted a threat

assessment for the Administrator's trip to Afghanistan without finalizing security arrangements. USAID Ex. O.  USAID contends that even in draft form, threat assessments must contain accurate security information and therefore the "Misrepresentation of Material Fact" charge is warranted.  See Blackshaw Dep. at 69:13-70:13 (Nov. 21, 2005); MSPB Tr. at 17:18-19:1, 48:4-19 (Apr. 19, 2006).  Talavera counters that, at all times, Blackshaw and Coston, who initiated her termination proceedings, understood the threat assessment to be a draft and that other Regional Operations Officers routinely submitted draft threat assessments.  Talavera Opp'n at 38-39.  The second charge, "Providing False Information to a Supervisor," alleges that Talavera lied to Blackshaw when she told him that Jim McDermott had apologized to her for his curt email. USAID Ex. O.  Talavera claims that, contrary to Blackshaw's understanding, she was not referring to Jim McDermott when she told Blackshaw that a "Jim" apologized to her.  Hence, according to Talavera, the allegation that she lied about the apology from McDermott is false. Talavera Ex. 19 at 13.

As a threshold matter, any dispute regarding the alleged conduct is wholly irrelevant without evidence that Blackshaw did not honestly believe the allegations to be true and worthy of termination.  "Once the employer has articulated a non-discriminatory explanation for its action, the issue is not the 'correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes the reasons it offers.'"  Fischbach v. District of Columbia Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992)); see also Pignato v. Am. Trans Air, Inc., 14 F.3d 342, 349 (7th Cir.1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not

just, or fair, or sensible.  He must show that the explanation given is a 'phony reason.'");

Kennedy v. District of Columbia Gov't, 519 F. Supp. 2d 50, 63 (D.D.C. 2007) (same).

To demonstrate that Blackshaw and Coston did not honestly believe in the veracity of the

misrepresentation charge, Talavera points to (1) the "DRAFT" label on the threat assessment, (2)

emails from Coston and Blackshaw referring to the threat assessment as a draft, (3) Coston and

Blackshaw's modifications to her threat assessment, (4) an earlier threat assessment for a trip to

Ireland that she wrote in the same format as the Afghanistan threat assessment, and (5) Mira's

testimony that his threat assessments went through multiple drafts.  See Talavera Opp'n at 38-39;

Talavera Exs. 20, 21; MSPB Tr. at 22-25 (Apr. 19, 2006).  Initially, the mere fact that the

document was a draft does not undermine the agency's assertion that the threat assessment

contained unsubstantiated information.  In fact, Coston referred to the threat assessment as a

"draft" even when reprimanding Talavera for providing inaccurate security information.  See

Talavera Ex. 20 at 11 (February 4, 2005 email from Coston stating "[i]f the Draft was the same

one I reviewed before going [on a tour of duty] it was not accurate and you will have passed

false information in stating that an escort and armored vehicles would be provided when in fact

the [Regional Security Officer] has not made a decision").  This bolsters USAID's argument that

it was office policy not to submit threat assessments with incomplete security details.

Moreover, Blackshaw's and Coston's edits to the Afghanistan threat assessment do not

pertain to substantive security information, but rather to grammar, typos, and unclear phrases.

See Talavera Ex. 20 at 2-6.  Mira's testimony also supports the characterization of threat

assessment edits as non-substantive.  See MSPB Tr. at 22-25 (Apr. 19, 2006).  The only

substantive changes that Mira mentioned concerned alterations to an Administrator's schedule

that would require "eliminat[ing] the station [that the Administrator was visiting]" from the draft. <u>See</u> <u>id.</u> at 25.

Finally, that Talavera had previously submitted a draft threat assessment for Ireland with inaccurate information does not undermine the misrepresentation charge with respect to the Afghanistan threat assessment.  The evidence demonstrates that Blackshaw, who ultimately terminated Talavera, believed that providing inaccurate information in a threat assessment was an unacceptable practice.  <u>See</u> USAID Ex. S.  After learning that security arrangements had not been finalized, he emailed Talavera:  "How can you provide a draft administrator's travel assessment memo . . . when you . . . have not heard anything from your request for information . . . on the Administrator's visit? . . . [D]on't resubmit until you provide post input and have made an assessment on the proposed trip."  <u>Id.</u>  Mira's testimony corroborates this practice.  <u>See</u> MSPB Tr. at 17:18-19:1 (Apr. 19, 2006) (stating that if security arrangements had not been finalized, "I would say . . . [t]he arrangement is pending" and "we wouldn't put a [security arrangements] placeholder like [the one Talavera drafted]").  For her part, Talavera fails to point to any evidence to counter Blackshaw's stated belief that the inaccurate threat assessment violated office policy.  <u>See</u> Blackshaw Dep 69:13-70:13 (Nov. 21, 2005) (stating that although "there is always a refinement of the document itself," the draft submitted to him should be "a product that the [Regional Operations Officer] considers finished").

Similarly, Talavera fails to muster any evidence that Blackshaw did not honestly believe that she lied about the phone call from Jim McDermott.  Indeed, the evidence that the allegation itself was false is extremely weak.  Talavera first contends that Blackshaw and Coston are not credible because they alleged that she conveyed the false information "on or about February 21,

2005," when she was on vacation and later on jury duty.  See Talavera Ex. 19 at 6; Talavera Exs. 22, 23.  She also asserts that her own March and April 2005 statements that "I told [Blackshaw] I received a call from a 'Jim' who I understood to be the Kabul EXO [McDermott]" and that Blackshaw "made a big deal of my saying it was from Kabul" were typos and do not reflect the true substance of her conversation with Blackshaw.  See USAID Exs. V, W; Talavera Dep. at 296:4-311:11 (May 14, 2008); Talavera Opp'n at 42.

Talavera's absence from the office from February 21 to 23 does nothing to undercut the false information charge.  See Talavera Exs. 22, 23.  Her argument amounts only to asserting that Blackshaw and Coston do not remember the exact date of the conversation, not that the conversation never took place.  Moreover, the record indicates that Blackshaw emailed McDermott on February 21, 2005, asking "did you call Carmen Talavera on Thursday, 2/17/05," thus suggesting that the conversation did take place "on or around February 21."  USAID Ex. U. This email also suggests that Blackshaw honestly believed that Talavera told him that McDermott had called her to apologize.

Additionally, Talavera admits that her March and April 2005 statements are inconsistent with her current recollection of her conversation with Blackshaw.  Talavera Dep. at 297:9-12 (May 14, 2008).  Her written response to her Notice of Proposed Removal was also inconsistent with her previous statements, saying, "I had talked to a 'Jim' on the phone.  This Jim had been apologetic about a delay in billing."  USAID Ex. AA at 2276.  And if her statements can be reconciled as "typos," as she claims, they hardly demonstrate that the false information charge was "phony" or that Blackshaw did not believe that Talavera had lied to him about receiving an apology from McDermott.  See Fischbach, 86 F.3d at 1183.  Even if Blackshaw misconstrued

her statements, the inquiry is not whether the "reason given for a job action is not just, or fair, or sensible," Pignato, 14 F.3d at 349, but "whether the employer honestly believes in the reasons it offers." Fischbach, 86 F.3d at 1183.  The record demonstrates that Blackshaw deferred the penalty decision to Human Resources and thoughtfully considered his decision to terminate Talavera.  See MSPB Tr. at 14:23-18:8, 81:17-82:12 (Mar. 28, 2006) (statement by a Human Resources officer explaining that Human Resources, not Coston or Blackshaw, recommended the penalty of termination); Blackshaw Dep. at 61:6-20 (Nov. 21, 2005).  The evidence does not show, then, that Blackshaw violated agency procedure, that he was motivated by discriminatory or retaliatory animus, or that he did not honestly believe that he had grounds to terminate Talavera's employment.

A court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." Fischbach, 86 F.3d at 1183.  The Court concludes, then, that given the lack of any evidence of discriminatory or retaliatory intent, no reasonable jury could conclude that USAID's reasons for terminating Talavera were pretextual.  Accordingly, summary judgment will be entered in favor of USAID on these claims.

## CONCLUSION

For the foregoing reasons, the Court will grant USAID's motion for summary judgment with respect to all claims.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  August 31, 2009